UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC DIXON,<br><br>Plaintiff,<br><br>-against-<br><br>SECURESPACE MANAGEMENT LLC.,<br><br>Defendant. | Civil Action No.:<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Eric Dixon ("Plaintiff" or "Mr. Dixon") by and through his attorneys, FJ Law, hereby complains about Defendant SecureSpace Management LLC ("SecureSpace," the "Company," or "Defendant") and alleges, as follows:

**PRELIMINARY STATEMENT**

1. This action arises from Defendant's failure to address Mr. Dixon's serious workplace safety and misclassification complaints. Unfortunately, Defendant, a company owning and operating a vast network of storage facilities across the United States, prioritized profit over the safety of its staff and the public.

2. Throughout his employment with Defendant, Mr. Dixon acted as the store manager at the Company's Maspeth, Queens location (the "Facility"). When he raised concerns about serious safety risks and hazardous conditions at the Facility, Defendant largely ignored him. Sadly, when he continued to complain about legitimate life safety issues, he was fired.

3. For example, Mr. Dixon complained several times over multiple months about the dangerous, unregulated conditions of the Facility's two elevators, which were never inspected during his employment with Defendant and within which Mr. Dixon and other individuals had been trapped.

4. Worse, Defendant had full knowledge of its deficiencies, including the fact that as of the time of Mr. Dixon's tenure, the elevators had not been inspected in more than two (2) years.

5. Mr. Dixon was hired by Defendant, in part, due to his expertise in his field, having worked in a managerial role for a competing storage company. Mr. Dixon was responsible for renting units to customers, as well as maintaining building standards and cleaning the property.

6. From the outset, Mr. Dixon made it clear that safety within the Facility was paramount. As such, he prioritized the mandatory state elevator inspection and attempted to schedule this inspection within the first couple months of his time with Defendant.

7. However, instead of hiring an experienced professional to identify and maintain the elevators, Defendant ignored its responsibilities, thus gambling with the safety and well-being of its customers and staff alike.

8. Plaintiff bravely refused to ignore Defendant's carelessness and, ultimately, filed formal complaints with The Department of Labor and NYC's 311 safety hotline, actions that would become the catalyst for Defendant's pretextual termination of Plaintiff's employment on July 10, 2024.

9. Defendant's conduct not only exceeded basic morals and decency but also violated the law. As such, Plaintiff seeks to recover his actual damages, compensatory damages, punitive damages, and his reasonable attorneys' fees and costs.

10. Plaintiff complains pursuant to New York Labor Law ("NYLL"), among other laws, as set forth below.

## JURISDICTION & VENUE

11. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) as Defendant and Plaintiff are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to this action occurred within this District.

## PARTIES

13. Plaintiff Eric Dixon is an individual who, at all relevant times, resides in Kings County, New York.

14. Upon information and belief, Defendant SecureSpace Management LLC is a foreign limited liability company duly authorized to conduct business in the State of New York and maintains a principal place of business located at 100 Wilshire Blvd., Suite 1400, Santa Monica, CA 90401.

15. At all times material to the Complaint, SecureSpace conducted business in the State of New York. Upon information and belief, the members of SecureSpace are Paul B. Brown and Charles A. Brown IV, both of whom are residents of the State of California. Therefore, SecureSpace is a citizen and resident of Delaware and California.

16. At all relevant times, Defendant was an "Employer" or "Covered Employer" and supervisor of Plaintiff as stated by, including, but not limited to, the definition of the term under the NYLL.

17. At all relevant times, Plaintiff was an "Employee" or "Covered Employee" of Defendant as stated by, including, but not limited to, the definition of the term under the NYLL.

## MATERIAL FACTS

***Plaintiff's Employment with Defendant***

18. Plaintiff worked for Defendant as a Store Manager at its Maspeth, Queens, New York location starting in July 2023, until his wrongful termination on or around July 10, 2024.

19. At all relevant times, Plaintiff reported to Christopher Francisco ("Francisco"), his direct supervisor at SecureSpace Management.

20. In this role, Mr. Dixon's responsibilities included renting storage units to customers, maintaining facility safety standards, and cleaning the property. Specifically, Mr. Dixon's daily duties included patrolling the various floors of the Facility, locking doors at the close of his shift, sweeping the hallways across all six floors and sanitizing the bathrooms. Further, Mr. Dixon was responsible for clearing up any flooding with Defendant's machines, an unfortunately common occurrence.

21. Additionally, Mr. Dixon frequently addressed problems with the elevators. However, rather than remedy the safety concerns, Defendant expected Mr. Dixon to simply avoid using the elevators, requiring him to walk up and down the six flights of stairs.

22. Mr. Dixon immediately established himself as a team player and provided substantial value to Defendant, as he always performed his job duties well. Throughout his employment with Defendant, Mr. Dixon received no warnings, neither verbal nor written, and consistently excelled in his role, delivering excellent service to both customers and Defendant.

***Mr. Dixon Complained of Unlawful Pay Practices.***

23. Around October 2023, Mr. Dixon emailed the Human Resources ("HR") Department to inquire about his pay since he reasonably believed that he should have been classified as a "manual worker" under NYLL and paid on a weekly basis and not biweekly, as Defendant was doing.

24. Shockingly, the HR representative flippantly dismissed Mr. Dixon's concern and declared he did not qualify as a manual worker. Mr. Dixon requested clarification regarding his classification but never received a response.

***Mr. Dixon Made a Formal Complaint to the New York State Department of Labor.***

25. Despite his several requests, Mr. Dixon was ignored for months. As such, on or about May 3, 2024, Mr. Dixon made a formal complaint to the New York State Department of Labor ("DOL") regarding Defendant's failure to address his "manual worker" status and pay him on a weekly basis.

26. Mr. Dixon reasonably believed he was a manual worker as he spent more than 25% of his time on his feet doing tasks including patrolling, maintaining and cleaning the building.

27. Upon information and belief, Defendant became aware of this DOL complaint soon after Mr. Dixon filed the complaint with the DOL.

***Mr. Dixon Made Repeated Complaints of Egregious Workplace Safety Violations.***

28. Aside from the pay issue, Defendant observed a concerning disregard for the life safety of its employees and customers.

29. In particular, Mr. Dixon grew increasingly uneasy about the condition, maintenance, and inspection status of the two elevators in the Facility, as reliability and basic function were routine issues for these critical pieces of equipment used daily by employees and customers to move about the building.

30. The elevators malfunctioned frequently and posed significant safety risks to the staff and customers. Still, Defendant failed to take meaningful action to remedy these issues despite repeated concerns raised by Mr. Dixon.

31. Accordingly, in or around December 2023, Mr. Dixon reached out to Francisco and David Haro ("Haro"), Director of Facilities Management, to discuss the safety and operation of the elevators and complain about the elevators' dangerous conditions.

32. On or around December 9, 2023, Haro responded to Mr. Dixon's complaints with a list titled "*Five Things to Check Before Requesting Elevator Service*," an action clearly intended to discourage any further protected complaints from Mr. Dixon and to suggest that his actions were otherwise improper for insisting on repairs.

33. Inasmuch as Defendant ignored Mr. Dixon's continued complaints, on or around January 20, 2024, Mr. Dixon escalated his concerns about workplace safety to higher level managers within the Company. Still, his complaints went unresolved.

34. Frustrated and increasingly concerned for his safety and those around him, on or about January 22, 2024, Mr. Dixon emailed a video to management, showing the hazardous state of the elevator. The video showed the elevator stuck between floors and functioning unpredictably, both regular occurrences. The elevator's doors repeatedly opened and closed on their own, creating a significant risk of injury or entrapment for anyone attempting to use it.

35. Mr. Dixon hoped this visual evidence would finally prompt substantive action, as the issue had grown increasingly severe and posed a clear and ever-present danger to employees and customers.

36. Again, Mr. Dixon was told, by Defendant, that a technician would examine the elevator. However, as had happened previously, the technician undertook only a cursory inspection and performed no meaningful repair work.

37. Defendant thereafter assured Mr. Dixon that another technician would evaluate the elevator, but this did not happen. In essence, the Defendant's efforts were at best perfunctory in nature, but more importantly, callously ignored the glaring safety issues.

38. Eventually, at Mr. Dixon's insistence, a different elevator technician inspected the elevators and performed some manner of repair, such that the issue causing the doors to open and close uncontrollably was seemingly resolved.

39. Unfortunately, this "repair" lasted less than two weeks.

40. This recurring pattern underscores the need for a commonsense - and legally compliant - elevator maintenance program. The elevators are essential to the business operation given the Facility's massive size and high volume of foot traffic (there are approximately 1,100–1,500 storage units on site). In short, the malfunctioning elevators posed a significant *daily* life-safety risk to staff and customers.

41. Still, Defendant was indifferent, as evidenced by the lack of routine inspection. Indeed, Tom Flynn ("Flynn"), Defendant's Facilities Manager, acknowledged in an email from April 5, 2024 that the elevators had not been inspected since 2022.

***Mr. Dixon's Fears Came to Fruition***

42. On March 30, 2024, an individual became trapped in a malfunctioning elevator as it moved up and down floors uncontrollably.

43. While the customer remained stuck inside the elevator, screaming for help, Mr. Dixon ran upstairs to call the elevator to another floor, which stopped the elevator car and allowed the customer to escape scared but uninjured.

44. Later that same day, Mr. Dixon himself became trapped, with the elevator exhibiting the same erratic movements. Fortunately, he escaped uninjured as well.

45. Thereafter, throughout April and into May 2024, Mr. Dixon regularly contacted management regarding the dangerous elevator conditions. Still, Defendant failed to take action.

46. By this point, Elevator One was completely out of service for over a month and Elevator Two posed a daily threat to trap riders, rendering it functionally out of service too.

***Defendant's Continued Disregard for the Safety of Employees, Customers, and the Law***

47. On May 6, 2024, another customer became trapped in the elevator, which had become unresponsive and moved erratically between floors. The customer frantically pressed buttons screaming for help until the doors finally opened.

48. Mr. Dixon sent yet another email to management, calling out Defendant's ongoing failure to cure the dangerous conditions. More than twenty-four (24) hours later, Defendant replied and instructed Mr. Dixon to direct the technicians already scheduled for a separate service to address this elevator issue as well.

49. As before, the technicians performed only a temporary repair.

50. In fact, on May 25, 2024, Elevator Two moved unpredictably at high speed, trapping a fourth customer inside.

51. As before, Mr. Dixon sent another email to Defendant detailing this incident. Predictably, Defendant again failed to cure the defective and dangerous conditions.

***Mr. Dixon Made a Formal Complaint to 311 Regarding the Dangerous Elevators.***

52. On June 5, 2024, just over one month after complaining to the DOL, Mr. Dixon made a complaint to the City of New York by calling the 311 hotline and detailing the ongoing dangerous condition of the elevators.

53. Upon information and belief, an employee of the City of New York responded to his "311" complaint and informed Defendant that one of their representatives would visit the building to investigate the elevators.

***Mr. Dixon Faced Swift Retaliation for His Protected Complaints.***

54. In early July 2024, Francisco unexpectedly appeared at the building, something he rarely did.

55. Oddly, Francisco claimed he wanted to give Mr. Dixon a "friendly alert" that he had recently been "checking the cameras," and accused Mr. Dixon of "fail[ing] to perform assigned duties effectively."

56. Mr. Dixon was shocked, since his performance was never an issue and he frequently took on and executed additional responsibilities outside his job description.

57. Instead of recognizing Mr. Dixon's dedication to the Company, Defendant subjected him to excessive and retaliatory surveillance following his complaints to the DOL and the 311 hotline.

58. Upon information and belief, other employees who did not raise such concerns faced no such scrutiny.

***Defendant's Retaliatory Animus Reached Its Zenith as Plaintiff's Employment was Unlawfully Terminated.***

59. Only days later, on or around July 10, 2024, Mr. Dixon arrived for his shift when he received another surprise visit from Francisco, at which point his employment was terminated.

60. Dumbfounded, Mr. Dixon asked for an explanation. Francisco vaguely alluded to his "failure to perform his assigned duties," which was thinly veiled pretext for Defendant's retaliatory and unlawful motives.

61. Simply put, Mr. Dixon was fired because he would not ignore Defendant's unlawful wage practices and the inexcusable failure to remedy the patently dangerous conditions of the Facility.

62. Defendant's actions were intended to, and did, create a hostile and unsafe work environment that no reasonable person would tolerate.

63. As a result of his unlawful termination, Mr. Dixon was humiliated, degraded, victimized, embarrassed, and emotionally distressed.

64. As a result of the acts and conduct complained of herein, Mr. Dixon has suffered and will continue to suffer the loss of income, salary, bonuses, benefits and other compensation which such employment entails, and he has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

65. As Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Mr. Dixon demands punitive damages.

**AS A FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT**
**RETALIATION IN VIOLATION OF NEW YORK LABOR LAW § 740**

66. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

67. New York State Labor Law §740 provides, in relevant part:

> An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee does any of the following:
>
> (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety;…

68. On occasions too numerous to specify, and specifically in connection with the unsafe and hazardous conditions ignored by Defendant and its unlawful wage practices, Plaintiff reported unlawful conduct in good faith.

69. Defendant violated the section cited herein by retaliating against Plaintiff for his complaints regarding Defendant's conduct which Plaintiff reasonably believed violated New York State laws, federal laws, and regulations.

**AS A SECOND CAUSE OF ACTION AGAINST DEFENDANT**
**RETALIATION IN VIOLATION OF NEW YORK LABOR LAW §215**

70. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

71. NYLL § 215 (1)(a) provides, in pertinent part:

> No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter… (emphasis added).

72. The law imposes a non-delegable duty on employers to protect the health and safety of employees and mandates: "All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places." NYLL §200. The NYLL also provides employees with protections regarding proper compensation.

73. As set forth herein, Plaintiff made several complaints relating to wage violations, retaliation, as well as unsafe and dangerous conditions with respect to his workplace, which Plaintiff reasonably and in good faith believed violated the sections of the NYLL.

74. The complaints included, but were not limited to, wage irregularities and unsafe conditions in Defendant's Facility. Plaintiff reasonably believed these were violations under the law.

75. Indeed, NYLL § 200 imposes a duty on employers to protect "lives, health and safety of all persons employed." Plaintiff reasonably believed the Defendant failed to do so as it exposed himself, other staff, and customers to an increased risk of entrapment and/or injury. He complained about the same, thereby engaging in protected activities, and suffered adverse employment actions in retaliation, including inferior terms and conditions of employment, and ultimately, unlawful termination.

76. Defendant violated the section cited herein by retaliating against Plaintiff for his protected activities and complaints of Defendant's conduct which Plaintiff reasonably believed violated New York State laws, federal laws, and/or regulations.

**AS A THIRD CAUSE OF ACTION AGAINST DEFENDANT**
**VIOLATION OF NYLL § 191 – FAILURE TO PAY TIMELY WAGES**

77. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

78. The timely payment of wages provision of NYLL § 191 and its supporting regulations apply to Defendant and protect Plaintiff from untimely payment of wages.

79. Defendant is an employer within the meaning of NYLL § 190 and Defendant routinely failed to pay Plaintiff timely wages.

80. Further, Plaintiff is a "manual worker" within the meaning of NYLL § 190(4).

81. As a manual worker, Defendant was required to pay Plaintiff "not later than seven days after the end of the week in which the wages are earned" as required by NYLL § 191(1)(a)(i).

82. With Defendant paying Plaintiff every fourteen (14) days rather than every seven (7) days, Defendant did not pay Plaintiff in compliance with NYLL. Plaintiff did not agree to be paid every fourteen (14) days.

83. Defendant failed to pay Plaintiff on a timely basis as required by NYLL § 191(1)(a).

84. Due to Defendant's violations of the NYLL, Plaintiff suffered an injury in fact and is entitled to recover from Defendant the amount of his untimely paid wages as liquidated damages, reasonable attorneys' fees and costs, pre-judgment and post-judgment interest as provided for by NYLL § 198.

## **JURY DEMAND**

85. Plaintiff requests a jury trial on all issues to be tried.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests a judgment against Defendant as follows:

A. Declaring that the Defendant engaged in unlawful employment practices prohibited by NYLL, in that Defendant retaliated against Plaintiff for making protected complaints and engaging in other activity protected under the law;

B. An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C. Awarding damages to the Plaintiff for any lost wages and benefits, past and future, back pay and front pay, and interest, resulting from Defendant's unlawful employment practices;

D. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation in an amount to be determined;

E. Awarding Plaintiff punitive damages and civil penalties;

F. Awarding Plaintiff all interest, attorneys' fees, costs, disbursements and expenses incurred in the prosecution of the action; and

G. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper.

Dated: November 4, 2026
Purchase, New York

Yours, etc.

FJ LAW

By: ______________________

Joseph Jeziorkowski, Esq.
Daniel Folchetti, Esq.
*Attorneys for Plaintiff*
*Eric Dixon*
2975 Westchester Ave., Suite 418
Purchase, New York 10577
914-730-2422
joe@fjlglaw.com
dfolchetti@fjlglaw.com